# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| AMEN EL, PHARAOH EL-FOREVER LEFT-I, | Case No. 20-CV-1327 (DSD/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| PAUL SCHNELL, et al., | |
| Defendants. | |

This matter is before the Court on Plaintiff Pharaoh El-Forever Left-i Amen El's Motion for Temporary Restraining Order (Dkt. 56); Defendants' Motion to Dismiss (Dkt. 58); Plaintiff's "Purposed [sic] Third Amended Complaint" (Dkt. 77); and Plaintiff's "Rule Nisi" (Dkt. 87), which the Court construes as a Motion for Order to Show Cause. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Plaintiff's Motion for a Temporary Restraining Order be denied, Defendants' Motion to Dismiss be granted, Plaintiff's "Purposed [sic] Third Amended Complaint" (which the Court construes as a Motion to Amend the Second Amended Complaint) be denied, and Plaintiff's "Rule Nisi" Motion for Order to Show Cause be denied.

# I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Amen El[1] is currently incarcerated at the Minnesota Correctional Facility-Stillwater in Bayport, Minnesota ("MCF-STW").  (Dkt. 1 ¶ 3.)  On June 8, 2020, Amen El filed his Complaint against multiple defendants in their individual and official capacities, seeking relief pursuant to "42 U.S.C § 1983, Religious Land Use and Institutionalized Persons Act of 2000, Personal Injury Medical Malpractice, Suit of Equity, and under any other relevant cause of actions that [sic] various applicable laws willing to provide relief against Defendants."  (Dkt. 1 at 1-2.)  Specifically, Amen El asserted four claims against Defendants, alleging that: (1) Minnesota Department of Corrections officials ("MDC Officials") have adopted a policy with respect to "Offender Names" that violates his rights under the First Amendment by failing to honor and recognize his religious name change (*id.* at 3-5.); (2) certain Defendants violated his due process rights by "obstruct[ing] the prose[cution]" of a lawsuit he filed in "Washington Counties District Court" (*id.* at 5-7.); (3) MDC Officials violated his First Amendment rights by transferring him from the Minnesota Correctional Facility-Rush City to MCF-STW in retaliation for and in an attempt to "moot" a lawsuit Amen El brought against the officials in Chisago County District Court (*id.* 7-9.); and (4) he was provided insufficient medical treatment for his "chronic low back pain" in violation of the First and Eighth Amendments.  (*id.* 9-11.)

---

[1]    The parties use "Amen El" and "Plaintiff" interchangeably.  The Court does the same.

Because Plaintiff failed to pay the required filing fee with his Complaint, on July 21, 2020, the Court ordered Plaintiff to pay the filing fee or file an application to proceed in forma pauperis ("IFP").  (Dkt. 3.)  Plaintiff thereafter filed an IFP application and paid an initial filing fee of $56.49.  (Dkts. 7, 16.)  On October 13, 2020, Plaintiff filed his First Amended Complaint, asserting essentially the same claims as those in the Initial Complaint, adding new defendants in their official and individual capacities, removing other defendants, and adding a claim that the defendants violated his First Amendment rights by interfering with his access to the courts.  (Dkt. 12.)

On November 3, 2020, Amen El filed a "Supplemental Attachment to Amended Complaint" in an attempt to add a claim based on COVID-19 to his First Amended Complaint and a "Motion and Notice of Motion for Ex Parte Order to show Cause and Emergency Hearing" ("Ex Parte Motion for Order to Show Cause").  (Dkts. 13, 15.)  In the Ex Parte Motion for Order to Show Cause, which the Court construed as a motion for preliminary injunction, Amen El wanted (1) to be allowed "to purchase a more efficient face mask, and other [personal protective equipment] to protect against him contracting COVID-19"; (2) to be provided "a spraybottle [with] disinfectant for any time use"; and (3) unspecified "staff" to be forced to take an "ethics training . . . on the sanctity of life in association [with] how they treat inmates."  (Dkt. 13 at 4.)  The undersigned recommended denial due to procedural and substantive deficiencies on November 23, 2020 (Dkt. 23), Amen El filed "letter for reconsideration" and an objection (Dkts. 24, 31), and on February 19, 2021, U.S. District Court Judge David S. Doty overruled Amen

El's objection and adopted the Report and Recommendation in its entirety. (Dkt. 41 at 1, 4-8.)

On December 3, 2020, Amen El filed a "Motion for TRO…(ex parte order to show cause)" ("First TRO Motion"). (Dkt 27.) In the First TRO Motion, Amen El sought at least ten forms of relief relating to his COVID-19 claim pending a future preliminary injunction hearing.[2] (*Id.*) On January 21, 2021, the Court recommended denying the First TRO Motion due to procedural and substantive deficiencies. (Dkt. 33.) Amen El then sought dismissal of the First TRO Motion without prejudice in his objection to that recommendation (Dkt. 35), and Judge Doty granted Amen El's request on February 19, 2021. (Dkt. 41 at 1, 7-8.)

---

[2]    Amen El sought the following relief:

1.) Ability to clean food packages and surfaces in cell at will. Provide or allow Amen El, the opportunity to purchase a miniature spray bottle.
2.) Ability to access private mental health service through medicaid and have MNDOC honor treatment results . . . (telehealth) . . .
3.) Ability to access private medical health care through medicaid and have MNDOC honor results . . . (telehealth) . . .
4.) Ability to purchase masks that don't pose risk to safety and security of facility, and that are fitted for exercising . . .
5.) Ability to purchase gloves that don't pose risk to safety and security of facility.
6.) Ability to purchase protective eye equipment.
7.) A notice to staff informing them to reframe from speaking and behaving on accord w/ their political and personal beliefs that Covid is a hoax.
8.) Hire additional swampers to clean.
9.) Order against Herd Immunity Practices.
10.) Ability to take test from other sources not aligned with the DOC.

(Dkt. 27 at 9 (ellipses and errors in original).)

Meanwhile, on February 1, 2021, Amen El filed a "Notice of Motion and Motion for Equity Injunction, Preliminary Injunction and TRO" ("Second TRO Motion") seeking essentially the same relief as the First TRO Motion, along with a social distancing mandate and mandatory quarantines of staff if exposed to COVID-19-infected persons. (Dkts. 36, 36-1 at 17-18.)  The Court recommended denial of the Second TRO Motion on February 11, 2021.  (Dkt. 39.)  The Court noted numerous joinder problems in the First Amended Complaint and Supplement[3] because Amen El had alleged four separate and distinct claims in the First Amended Complaint and an additional claim in the Supplement, where each claim involved different subject matters and was asserted against multiple defendants in violation of Federal Rule of Civil Procedure 20(a)(2).  (*Id.* at 3-10.)  Because Amen El is a pro se litigant, the Court gave Amen EL "an opportunity to file a Second Amended Complaint"; instructed Amen El to "pick the one transaction or occurrence (or series of transactions or occurrences) that he wished to pursue in this action"; "limit the facts and allegations to the defendants involved in that transaction, occurrence, or series"; and "only include claims that arise out of the relevant transaction, occurrence, or series—in other words, claims that are related to each other."  (*Id.* at 11 (citing Fed. R. Civ. P. 20(a)(2).)  Otherwise, the Court would recommend dismissal without prejudice for failure to prosecute under Federal Rule of Civil Procedure 41(b).  (*Id.* at 11.)  The Court also recommended denial of the Second TRO Motion because the

---

[3]    Although it was not required to do so, *see* D. Minn. LR 15.1(a), the Court construed the Supplement as a motion to amend the First Amended Complaint.  (*see* Dkt. 39 at 13.)

propriety of the relief it sought depended on which claim Amen El decided to assert in a Second Amended Complaint.  (*Id.* at 12.)

Amen El did not object to the February 11, 2021 Report and Recommendation, and Judge Doty adopted it on March 9, 2021.  (Dkt. 44.)  On April 16, 2021, Amen El filed his Second Amended Complaint, in which he names 21 Defendants in their individual capacity only.[4]  (Dkt. 46 at 1.)  In the Second Amended Complaint, Amen El alleges that he was exposed to COVID-19 from approximately October 27 to December 4, 2020 at MCF-STW; that there was rapid spread of the COVID-19 virus at MCF-STW; that although Defendants "enacted cautionary measures" including "tests, masks, recommended social distancing, suspending visits temporarily, non-alcoholic hand sanitizer, amongst other things" to "reduce transmission, but ultimately these measures were inadequate, ineffective and or insufficient" because inmates were left to "police themselves," uninfected inmates were "mixed" with infected inmates, there were resource shortages, insufficient sanitation, and understaffing.  (*Id.* ¶¶ 1, 20-22, 25.)

Amen El further asserts that the Defendants' inadequate response to COVID-19 exposed him to "sufficient imminent danger" because he is hypertensive, has anxiety disorder, and chronic stress, and was moved to a cell that was previously occupied by a COVID-19 positive inmate.  (*Id.* ¶¶ 23, 26, 28.)  Amen El also asserts that Defendants'

---

[4]    The Defendants are: Paul Schnell, Guy Bosch, Tim Walz, "CPO Reed," "AWO Stenseth," "Psychology Director," "AWA Wanchena," Dan Kiser, "CPO Huppert," Susan Norton, "Health Services Director," "Assoc. Dir. Nursing T. Sneen," "Assoc. Dir. Behavioral Health," "Safety Dir. Karels," "Captain Connors," Minnesota Department of Health Commissioner Jan Malcom, "MDH liaison assigned to MNDOC," "CPO Quist," "Doc Med. Director Dr. Amsterdam," "Captain Darling," and "Jane Doe."  (Dkt. 46 at 1.)

COVID-19 response fell short because Defendants took a "reactive decision making approach"; the "Defendants responsible for overseeing precautionary measure enforcement failed to sufficiently enforce the measures"; "Schell, and other defendants [sic] predecessors" prioritized security over safety; Defendants "or their officers" provided inadequate administrative grievances procedures; unnamed Defendants could have "release[ed] more inmates or hous[ed] inmates [at] Appleton prison or County jails which were spacious"; as custodians, all Defendants "[especially] DOC officials were" "obligated to protect detainees"; and "custodians and all defendants listed knew of" the dangers posed by COVID-19 and "created or allowed" the alleged actions to continue. (*Id.* ¶¶ 29-40.) Based on these allegations, Amen El asserts (1) a count under 42 U.S.C. § 1983 for violation of his Eighth Amendment rights[5] and (2) a count asserting a state-

---

[5]     Although Amen El references the Fourteenth Amendment in his Introduction (Dkt. 46 at 2), he does not assert a standalone procedural or substantive due process claim, and his response to the Motion to Dismiss suggests he references the Fourteenth Amendment because "[t]he 8th Amendment has been made applicable to the states through the 14th Amendment" (Dkt. 63 at 4.) In any event, Defendants argued that any procedural or substantive due process claim should be dismissed (Dkt. 59 at 6-9), and Amen El did not respond to those arguments. The Court finds Defendants' arguments persuasive. First, Amen El has not identified a protected liberty interest or fundamental right implicated by the alleged conduct. As to any substantive due process claim, and for the reasons stated in connection with his Eighth Amendment claim, he has not plausibly alleged "both that [Defendants'] conduct was conscience-shocking, and that [Defendants] violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Slusarchuk v. Hoff*, 346 F.3d 1178, 1181-82 (8th Cir. 2003) (cleaned up). Moreover, the Court notes that because the Eighth Amendment covers prisoner claims challenging the conditions of their confinement, that Amendment−not the Fourteenth Amendment's guarantee of substantive due process−governs. *See McChristian v. Hampton*, 48 F.3d 1224, 1224 (8th Cir. 1995) (unpublished table decision) (holding that a prisoner's excessive force claim was properly analyzed under the Eighth Amendment and not substantive due process, which provided no additional

law negligence claim.[6]  (*Id.* at 2, 13-14.)  He seeks $642,857.145 in punitive damages as well as $642,857.145 in compensatory damages against Defendants, jointly and severally. (*Id.* at 14.)  Amen El attached to the Second Amended Complaint two Offender Kite Forms ("Kites") (Dkt. 46-1 at 22-23), Affidavits from himself and other inmates (Dkt. 46-1 at 24-34, 38-43), and a December 1, 2020 Declaration of MCF-STW Corrections Captain Andrew Darling ("Darling Declaration") that was submitted in connection with a lawsuit Amen El filed in Ramsey County District Court.  (*id.* at 44-48.)

Amen El relies on the Darling Declaration to support his allegation that MCF-STW "mixed" COVID-19 positive and negative inmates.  The Darling Declarations sets forth in detail the procedures MCF-STW has implemented in response to the COVID-19 pandemic, including: following MDH guidance as to monitoring, isolation/quarantine, and testing (*id.* ¶ 3); suspending in-person visits, requiring offenders to eat in their living

---

protections).  As to procedural due process, Amen El has not alleged facts plausibly suggesting Defendants have imposed "atypical and significant hardship" on him "in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484-85 (1985), and to the extent he seeks transfer from MCF-STW, he has no constitutional right to be transferred to another facility, *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983).

[6]    Amen El references a number of other Federal and Minnesota statutes, along with the "Minnesota State Constitution, Equity Principles, International Treaty Rights in American Declaration of Rights and Duties," and a Consent Decree issued in *Hines v. Anderson*, 439 F. Supp. 12 (D. Minn. May 27, 1977).  As of 1999, the Consent Decree only applied to Minnesota Correctional Facility – Oak Park Heights, and it was terminated entirely in 2008.  *See Hines v. Anderson*, 547 F.3d 915 (8th Cir. 2008).  The Second Amended Complaint does not assert any discernable claim under the other statutes, laws, and documents, nor does it explain how any was violated, so the Court addresses only the § 1983 claim based on alleged violations of the Eighth Amendment (Count 1) and the state law negligence claim (Count 2) in this Report and Recommendation.

units instead of the dining hall and restricting inmates to their living units (*id.* ¶ 4);
providing and replenishing barrier masks to inmates; the implementation of policies
requiring inmates and staff to wear masks, that an inmate is provided with a mask if he
requests one; that inmates may order approved masks for themselves (*id.* at 45 ¶¶ 5-6, 8);
screening staff for symptoms on a daily basis (*id.* ¶ 6); the availability of hand-sanitizing
stations and cleaning of common areas and touchpoints (*id.* ¶ 7); and COVID-19 testing
of inmates since May 2020.  (*id.* at 44 ¶ 14.)

As to the "mixing" of COVID-19 positive inmates with COVID-19 negative
inmates, Darling states:

- "[a]t no point in time did MCF-STW knowingly place offenders actively infected
  with COVID-19 in general population";

- that offenders who had previously tested positive for COVID-19 in July 2020 were
  placed in general population in August, 2020, which was 30 days after they tested
  positive, those inmates were asymptomatic, and "there was no reason to believe
  they were positive and infectious at that time";

- at the time of the Darling Declaration (December 1, 2020), COVID-19 positive
  and negative inmates were not housed in the same living units, nor were they
  before the October 2020 surge in cases, but there was a period of time during the
  surge and in light of space limitations where COVID-19 positive and negative
  inmates were housed in the same living units, but they were not placed in the same
  cell, they were not released to the common areas at the same time, and the

9

common areas were cleaned and disinfected for one hour before any inmate left his cell; and

- similarly, while COVID-19 positive and negative inmates used the same phones, showers, kiosks, and washers, "everything was cleaned after offenders returned to their cells and before the next set of offenders left their cells."

(*Id.* at 46-47 ¶¶ 9-10.)  As to Amen El's allegation that he was moved to a cell previously occupied by a COVID-19 positive inmate, Darling states that cells are cleaned after one inmate moves out and before another moves in, and also states that the inmate previously assigned to the cell Amen El moved into had vacated the cell on October 17, 2020, ten days before Amen El moved in.  (*Id.* at 46 ¶ 10, 47 ¶ 15.)

On May 20, 2021, the Clerk of Court sent notices of this lawsuit and a request to waive service of summons to Defendants.  (Dkts. 49, 50.)  On June 21, 2021, counsel for Defendants entered an appearance in this case on behalf of all Defendants except Jane Doe, the "Health Services Director" and "MDH Liaison Assigned to MNDOC," whom the DOC could not identify.[7]  (Dkt. 52.)

On July 12, 2021, Amen El filed a Motion for Temporary Restraining Order ("Third TRO Motion"), requesting that the Court require Defendants to test unvaccinated

---

[7]    The Notice of Appearance identifies "Assoc. Dir. Behavioral Health" as Diane Medchill, "Psychology Director" as Mena Otoo, "Doc Med. Director Dr. Amsterdam" as James Amsterdam, "Captain Connors" as Lisa Connors, "Captain Darling" as Andrew Darling, "CPD Huppert" as Stephanie Huppert, "Safety Dir. Karels" as Jim Karels, "CPD Quist" as John Quist, "CPD Reed" as Andrew Reed, "AWO Stenseth" as Lisa Stenseth, and "AWA Wanchena" as Victor Wanchena.  (Dkt. 52 at 1 n.1.)

inmates for the COVID-19 virus.  (Dkt. 56.)  The Court addresses the Third TRO Motion in Section IV.

Defendants filed a Motion to Dismiss on July 15, 2021.  (Dkt. 58.)  The Court addresses the Motion to Dismiss in Section III.

On August 4, 2021, Amen El filed a "Proposed Supplemental Attachment to 2nd Amended Complaint" ("Supplement to Second Amended Complaint").  (Dkt. 70.)  The Court addresses this Supplement to Second Amended Complaint in conjunction with the Motion to Dismiss, in Section III.

On August 20, 2021, Amen El filed a "Purposed [sic] Third Amended Complaint" ("Proposed Third Amended Complaint") seeking to "include less defendants and clarify any confusion . . . regarding the claims."  (Dkt. 77; Dkt. 77-1.)  The Court construes this as a Motion to Amend the Second Amended Complaint ("Motion to Amend").  Pages 2 to 12 of the Proposed Third Amended Complaint are copies of pages 2 to 12 of the Second Amended Complaint.  (*Compare* Dkt. 77-1 at 2-12 (showing Dkt. 46 ECF stamps), *with* Dkt. 46 at 2-12.)  Counts 1 and 2 and the Requests for Relief are essentially the same.  (*Compare* Dkt. 77-1 at 14-15, *with* Dkt. 46 at 13-14.)  On page 13 of the Proposed Third Amended Complaint, Amen El adds paragraph 41, in which he asserts that Defendants Schnell, Bosch, Reed, Stenseth, Connors, Quist, Huppert, Karels, Wanchena, Norton and Darling are "policymakers apart [sic] of an administrative team or overseeing daily operations" and are therefore liable to Amen El.  (Dkt. 77-1 ¶ 41.)  On page 14, Amen El adds paragraph 42, in which he asserts that "Psychologists and other mental health defendants (Diane Medchill, Mena Otoo and James Amsterdam) failed to

11

provide mental health support during the pandemic because they constantly referred plaintiff to an anxiety class that wasn't occurring." (*Id.* ¶ 42.) Amen El continues to rely on the Darling Declaration (*id.* ¶ 23) and, although he had the opportunity to do so, he did not dispute any of Darling's statements in the Proposed Third Amended Complaint.

On January 10, 2022, Amen El filed a "Rule Nisi" document that appears to be a request for the Court to order the Defendants to "respond . . . why the CDC recommendation shouldn't be instructive during this outbreak, including quarantine time" (Dkt. 87), which the Court construes as a Motion for Order to Show Cause and addresses in Section V, along with various "Judicial Notices" filed by Amen El. (Dkts. 83, 85, 86.)

## II.  MOTION TO AMEND THE SECOND AMENDED COMPLAINT

Although Amen El's Third TRO Motion (Dkt. 56) and Defendants' Motion to Dismiss (Dkt. 58) were filed before the Motion to Amend the Second Amended Complaint, the Eighth Circuit instructs courts to consider motions to amend the pleadings before ruling on any pending motions to dismiss. *See Pure County Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 955 (8th Cir. 2002); *see also Hazley v. Roy*, No. 16-cv-3935 (SRN/TNL), 2018 WL 1399309, *5 (D. Minn. March 20, 2018) ("Eighth Circuit precedent instructs that courts should not decide a party's motion to dismiss without also considering the opposing party's pending motion to amend the pleadings.") (citations omitted). Accordingly, the Court will first consider Amen El's Motion to Amend (Dkt. 77) before considering Defendant's Motion to Dismiss (Dkt. 58.) The Court will then address Amen El's Third TRO Motion (Dkt. 56) and will lastly consider Amen El's "Rule Nisi" Order to Show Cause (Dkt. 87) and "Judicial Notices" (Dkts 83, 85, 86.)

## A.    The Parties' Arguments

Amen El initially sought amendment of the Second Amended Complaint to "include less defendants and clarify any confusion . . . regarding the claims." (Dkt. 77 at 1.) Although much of the Proposed Third Amended Complaint is duplicative of the Second Amended Complaint, Amen El also added paragraphs 41 and 42, which try to connect Defendants by name to the alleged wrongdoing. He does not offer any reason why he could not have included paragraphs 41 and 42 in the Second Amended Complaint.

Defendants oppose amendment on procedural and substantive grounds. They argue that the Motion to Amend does not comply with Local Rule 15.1(b)(2) and that "amending [Amen El's] complaint would be futile" under Federal Rules of Civil Procedure 8 and 12(b)(6). (Dkt. 78 at 2-4.)

Amen El filed a reply to Defendants' opposition, arguing that "when considered in its totality," the Proposed Third Amended Complaint "set[s] out specific actions which casually connect each supervisor and or mental health defendant to unconstitutional and or negligent behavior . . . [and] includes the what, why, and how they are liable." (Dkt. 81 at 1.) Amen El relies in part on paragraph 41 to demonstrate a causal connection between "each supervisor and or mental health defendant to unconstitutional and or negligent behavior" and argues that Defendants "are liable for Plaintiff being unreasonably exposed to a contagious disease because they failed to manage the state of the facility, failed to maximize and maintain sufficient resources to prevent the spread of

COVID, [and] condoned insufficient enforcement of precautionary measures, etc." (*Id.* at 2.)

## B.    Legal Standard

Amen El has already twice amended his Complaint, first on October 13, 2020 and again on April 16, 2021. (Dkts. 12, 46.) Once a party amends a pleading under Rule 15(a)(1), a party can make additional amendments "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Defendants do not consent to Amen El's amendment request, so Amen El may amend the Second Amended Complaint only with leave of the Court. *Id.* In addition, Amen El is required to comply with the technical requirements for filing motions to amend pleadings set forth in Local Rule 15.1. *See Ernst v. Hinchliff*, 129 F. Supp. 3d 695, 726 (D. Minn. 2015) ("Notwithstanding Plaintiff's pro se status, Plaintiff is still bound to comply with the Local Rules of this Court.").

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. (15)(a)(2). The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court. *See, e.g.*, *Niagara of Wis. Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986). The Eighth Circuit has held that "[a]lthough amendment of a complaint should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend." *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (*citing Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989); *Chesnut v. St. Louis Cty., Mo.*, 656 F.2d 343, 349 (8th Cir. 1981)). Denial of leave to

amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party."  *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Where, as here, amendment is opposed based on futility, the Court must determine whether the proposed claims state a claim for relief.  *See Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) ("Denial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. . . . Accordingly, in reviewing a denial of leave to amend we ask whether the proposed amended complaint states a cause of action under the *Twombly* pleading standard . . . .") (citation and marks omitted); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018); *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007) ("[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion."); *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 936 (8th Cir. 2001) ("The denial of leave to amend based on futility means that the court found that the amended complaint failed to state a claim . . .").

To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaints must be taken as true. *See Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In addition, a court must afford the plaintiff all reasonable inferences from those allegations. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the U.S. Supreme Court in *Iqbal* and *Twombly*. Pro se complaints are construed liberally, but they still must allege sufficient facts to support the claims advanced. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (citations omitted).

Analysis under Rules 15 and 12(b)(6) generally requires a court to not consider matters outside the pleadings when determining whether to grant leave to amend. *See Arias v. Am. Family Mut. Ins. Co.*, No. 13-1681 (PJS/JJG), 2013 WL 12145854, at *2 (D. Minn. Oct. 28, 2013) (finding "[n]o matters outside the pleading may be considered" when conducting a futility analysis under Rules 12(b)(6) and 15) (citing *Casazza v. Kiser*, 313 F.3d 414, 417 (8th Cir. 2002)). If matters outside the pleadings "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, documents "necessarily embraced by

16

the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858

F.3d 520, 526 (8th Cir. 2017) (quoting *Enervations, Inc. v. Minn. Min. & Mfg. Co.*, 380

F.3d 1066, 1069 (8th Cir. 2004)). Thus, while courts primarily consider the allegations in

the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally

consider matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders, items appearing in the record of the case,

and exhibits attached to the complaint whose authenticity is unquestioned, without

converting the motion into one for summary judgment. *Id.*; *see also Miller v. Redwood

Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

## C.    Procedural Grounds

Defendants argue that the Motion to Amend should be denied because Amen El

did not comply with Local Rule 15.1. (Dkt. 78 at 3.) That Rule requires a motion to

amend a pleading to be accompanied by: "(1) a copy of the proposed amended pleading,"

and "(2) a version of the proposed amended pleading that shows — through redlining,

underlining, strikeouts, or other similarly effective typographic methods — how the

proposed amended pleading differs from the operative pleading." D. Minn. LR 15.1(b).

Amen El did not file a version showing how the Proposed Third Amended Complaint

differs from the Second Amended Complaint, which provides sufficient grounds for

denying the Motion. *See Dunbar v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 839, 845

n.5 (D. Minn. 2012) ("Plaintiffs also violated Local Rule 15.1 by failing to provide a

redline comparing the proposed complaint with their operative complaint. Such failure to

follow the rules of the court justifies denying leave to amend."), *as amended* (Apr. 12,

2012), *aff'd*, 709 F.3d 1254 (8th Cir. 2013).  Nevertheless, the Court also addresses the Motion on substantive grounds.

## D.    Substantive Grounds

Defendants also argue the Motion to Amend should be denied because the Proposed Third Amended Complaint's claims are futile.  (Dkt. 78 at 3-4.)  As discussed in Section I, the Proposed Third Amended Complaint is virtually identical to the operative Second Amended Complaint, except it names fewer Defendants and adds paragraphs 41 and 42.  (*Compare* Dkt. 77-1 at 2-12 (showing Dkt. 46 ECF stamps), *with* Dkt. 46 at 2-13.)  Paragraph 41 alleges that Defendants Schnell, Bosch, Reed, Stenseth, Connors, Quist, Huppert, Karels, Wanchena, Norton, and Darling are "policymakers apart [sic] of an administrative team or overseeing daily operations" and are therefore liable to Amen El.  (Dkt. 77-1 ¶ 41.)  Paragraph 42 alleges that "Psychologists and other mental health defendants (Diane Medchill, Mena Otoo and James Amsterdam) failed to provide mental health support during the pandemic because they constantly referred plaintiff to an anxiety class that wasn't occurring."  (*Id.* ¶ 42.)  Counts 1 and 2 and the Requests for Relief in the Second Amended Complaint and Proposed Third Amended Complaint are essentially identical.  (*Compare id.* at 14-15, *with* Dkt. 46 at 13-14.)  The exhibits are also virtually identical.  (*Compare* Dkt. 46-1 at 1-34, 38-48, *with* Dkt. 77-1 at 1-45.)

Defendants argue that the Proposed Third Amended Complaint suffers from the same problems as the Second Amended Complaint.  (Dkt. 78 at 2-4.)  Defendants' futility arguments essentially refer back to and correspond to their arguments in support of their

Motion to Dismiss the Second Amended Complaint. (*Compare id.*, *with* Dkt. 59 at 4-14, *and* Dkt. 74 at 4-9.) Because the Proposed Third Amended Complaint is effectively identical to (and inclusive of) the Second Amended Complaint that is the subject of the earlier-filed Motion to Dismiss, the Court considers Amen El's and Defendants' arguments made in connection with that Motion to Dismiss the Second Amended Complaint in this Section, as well as the arguments made in connection with the Motion to Amend.

Defendants argue that Amen El's claims are futile for three reasons: (1) the claims fail to satisfy Federal Rule of Civil Procedure 8; (2) Amen El has failed to allege facts which state a claim for relief and are therefore subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6); and (3) Amen El fails to adequately allege the Defendants' direct and personal involvement in the alleged unconstitutional conduct as required by 42 U.S.C. § 1983. (Dkt. 59 at 2, 4-12.)

### 1. Rule 8 and Direct and Personal Involvement

The Court jointly addresses Defendants' Rule 8 and failure to allege direct and personal involvement arguments. Defendants argue that Amen El has failed to satisfy Rule 8 because, while he "identified a myriad of alleged misconduct, he did not identify which defendant's conduct was unlawful." (Dkt. 59 at 4.) According to Defendants, Amen El "failed to specify which defendant is purportedly responsible for the acts alleged in the complaint" or what each specific Defendant failed to do. (*Id.* at 4-5.) Amen El responds that Defendants have "fair notice of the claim against them" and that "[o]ccasionally stating policymakers as custodians and grouping them is necessary

because the Administrative Team, COVID-19 Response Teams, etc., are responsible for the unconstitutional response." (Dkt. 63 at 1-2.) He further argues that because "administrative decisions are made behind doors and often those responsible for the decisions won't be immediately known until discovery, . . . implicating certain policymakers and stating amongst others is appropriate" and "[u]ltimately discovery may be inculpatory or exculpatory for certain individuals." (*Id.* at 3.)

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."[8] Fed. R. Civ. P. 8(a)(2). "A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012); *see also Tully v. Bank of Am., N.A.*, No. 10-4734 DWF/JSM, 2011 WL 1882665, at *6 (D. Minn. May 17, 2011) ("Plaintiffs assert each of the causes of action against the Defendants generally, but do not otherwise specify which claims are asserted against any particular defendant, or which specific claims each Plaintiff is asserting. Thus, the [] Defendants, and the Court, are left to guess which Plaintiffs are asserting which claims against which Defendants.

---

[8]    Amen El cites *Hishon v. King & Spalding*, 467 U.S. 69, 81 (1984), for the proposition that "[a] complaint cannot be dismissed at the pleading stage unless no relief could be granted under any set of facts that could be proved consistent with the allegations." (Dkt. 63 at 3 (quotation marks omitted).) This standard, which was set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), is no longer good law, *see Twombly*, 550 U.S. at 561-63.

The Court concludes that such pleading is inadequate and that Rule 8 requires greater specificity than that found in Plaintiffs' Amended Complaint.").

Here, Amen El names fourteen individual Defendants in the Proposed Third Amended Complaint. (Dkt. 77-1 at 1.) Amen El does not link any particular conduct to any particular Defendant. Instead, the Proposed Third Amended Complaint is replete with generalized allegations as to all Defendants, including that the "cautionary measures" enacted by all Defendants were "inadequate" (*id.* at 7), that "Schnell, Bosch, Walz, Darling, and all Defendants . . . actually exposed Plaintiff to sufficient imminent danger when they allowed [the alleged mixing of contagious and non-infected inmates] to continue" (*id.* at 7-8); that "Defendants responsible for overseeing precautionary measures failed to sufficiently enforce the measures" (*id.* at 10); that "custodians knew of the serious and substantial dangers caused by COVID-19" (*id.* at 12); and that "defendants were not proactive and recklessly disregardful of the consequences from mixing." (*id.* at 12-13). The Court agrees that these types of generalized allegations against all Defendants do "not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone*, 857 F. Supp. 2d at 831; *see also Tully*, 2011 WL 1882665, at *6. Moreover, the Affidavits attached to the Proposed Third Amended Complaint do not cure the deficiencies, as they contain the same type of generalized allegations about "correctional officers," "staff," "defendants," "MCF-STW staff," "MNDOC," "MNDOC staff," and "DOC staff/employees." (*E.g.*, Dkt. 77-2 at 24, 27, 29, 33, 35, 37, 39.)

Defendants also contend that Amen El fails to adequately allege Defendants' direct and personal involvement in the alleged unconstitutional conduct as required by 42 U.S.C. § 1983. (Dkt. 59 at 11.) According to Defendants, a "prison official's general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement necessary for individual liability." (*Id.*; *see also* Dkt. 66 at 14.)

According to Section 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . ." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.'" *Hines v. Smith*, No. 16-cv-3797 (DSD/SER), 2018 WL 7050674, *2 (D. Minn. Dec. 20, 2018) (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). "Public servants may be sued under section 1983 either in their official capacity, their individual capacity, or both." *Id.* (quoting *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "Government officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (citations omitted). The doctrine of vicarious liability is inapplicable in § 1983 suits. *Iqbal*, 556 U.S. at 676.

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [the plaintiff] must allege **specific facts** of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (emphasis added) (citations and marks omitted).  However, "a supervisor may still be liable under § 1983 if either his direct action or his failure to properly supervise and train the offending employee caused the constitutional violation at issue."  *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (cleaned up).  "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions."  *Id.* (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).

When responding to Defendants' arguments, Amen El fails to identify any "direct action or lack therefore" alleged in the Proposed Third Amended Complaint (or any attached Affidavit or Exhibit) with respect to any specific Defendant.  Instead, he argues for liability due to a generalized failure to train, failure to educate, failure to maximize or maintain resources, failure to make proactive decisions, and failure to enforce precautionary measures.[9]  (Dkt. 63 at 2-9.)  But at no point in the Proposed Third

---

[9]    Amen El's reliance on *City of Canton, Ohio v. Harris* is unpersuasive as that case involved whether and under what circumstances the failure to provide proper training could fairly be said to represent a policy for which the city is responsible under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and for which the city may be held liable if it actually causes injury.  489 U.S. 378, 389-90 (1989).

Amended Complaint or Amen El's argument does he say which named Defendant is allegedly responsible for which failures and which alleged conduct.  Under these circumstances, Amen El has not plausibly alleged any Defendant's personal involvement with the alleged violations.  *See Jackson,* 747 F.3d at 545 (finding prisoner plaintiff failed to state a claim against warden because he failed to "plead facts that plausibly show [the warden's] direct involvement . . . in the formation, implementation, or enforcement of that policy").

In fact, Amen El's opposition to the Motion to Dismiss demonstrates that he has named Defendants by virtue of their position rather than based on specific conduct attributable to Defendants.  He contends that he does not allege a claim of "respondent superior but [that this is] rather a case in which the officials, failed to train, condoned, created, or purposely turned a blind eye to unconstitutional behavior."  (Dkt. 63 at 6.)  But the Proposed Third Amended Complaint does not allege any facts connecting any failure to train, condonation, creation, or purposeful turning of a blind eye to any Defendant—all of his allegations along those lines are as conclusory as those found "not entitled to the presumption of truth" by the U.S. Supreme Court.  *See Iqbal*, 556 U.S. at 680-81 ("Respondent pleads that petitioners 'knew of, condoned, and willfully and maliciously agreed to subject him' to harsh conditions of confinement 'as a matter of policy, solely on account of his religion, race, and/or national origin and for no legitimate penological interest.' . . . The complaint alleges that Ashcroft was the 'principal architect'

---

Amen El does not assert a *Monell* claim; he names individual Defendants in their individual capacity.  (*See* Dkt. 77-1 at 1.)

of this invidious policy, . . . and that Mueller was 'instrumental' in adopting and executing it. . . . These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim . . . . As such, the allegations are conclusory and not entitled to be assumed true.") (cleaned up). Indeed, as to direct and personal involvement, Amen El admits that his "Liability" section is "basically premised on their superior position and their direct actions or lack thereof while operating in said positions." (Dkt. 63 at 6; *see also id.* at 2 (arguing all Defendants are liable because they are "highranking officials" who allegedly failed in a number of respects).)[10] Amen El further argues that "administrative decisions are made behind doors and often those responsible for the decisions won't be immediately known until discovery, therefore implicating certain policymakers and stating amongst others is appropriate" and "[u]ltimately discovery may be inculpatory or exculpatory for certain individuals." (*Id.* at 3.) But the hope that discovery will identify those responsible for the complained-of conduct is insufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 678-79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

---

[10]    The Proposed Third Amended Complaint confirms this is Amen El's theory, as he categorizes Defendants as either supervisors or policymakers (Dkt. 77-1 at 13 ¶¶ 40-41) or "mental health defendants" (*id.* at 14 ¶¶ 42) and then argues they are liable because they were part of an administrative team, oversaw operations, or (in the case of the mental health defendants) "constantly referred" him to "an anxiety class that wasn't occurring." (*Id.* at 13-14 ¶¶ 40-42.)

In sum, Amen El's allegations in the Proposed Third Amended Complaint are overwhelmingly vague as to who allegedly did what, and he has failed to allege any facts plausibly giving rise to the inference that any named Defendant is responsible for (or even knew of) any of the specific conduct alleged in the Proposed Third Amended Complaint.[11]  These failures justify denial of the Motion to Amend the Second Amended Complaint.  *See Tatone*, 857 F. Supp. 2d at 831 ("[T]he pleading standard articulated by Rule 8 'does not require detailed factual allegations, but it does demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'") (quoting *Iqbal*, 556 U.S. at 678) (cleaned up); *Johnson v. Minn. of Dep't Corrs.*, No. 12-cv-784 (PAM/JSM), 2012 WL 2050246, at *3 ("Thus, in order to state an actionable civil rights claim, a complaint must set forth specific factual allegations showing what each named defendant allegedly did, or failed to do, that purportedly violated the plaintiff's federal constitutional rights."). This warrants denial of the Motion to Amend.

---

[11]     Other examples of Amen El's generic identifications abound: "As a result of MCF-STW legally offensive and unreasonable response"; "Walz, Schnell, Bosch, MCF-STW H.S. Director, and any other party to the consent decree as successors failed to uphold their obligation"; "Insufficient sanitation was the fault of, Schnell, Bosch, Reed, Stenseth, Wanchena, Kiser, Huppert, Karels, Connors, Darling, amongst others"; "Amen El requested the Jane Doe provide him [with] cleaning supplies"; "Bosch, Schnell, Karels, Wanchena, amongst others failure to educate on balancing safety against security measures and or COVID-fatigue caused unnecessary exposure to COVID-19 unsanitary conditions"; "Defendants responsible for overseeing precautionary measure enforcement failed to sufficiently enforce the measures; "Schnell, and other defendants predecessors locked the facility down for over two weeks due to security concerns but not safety concerns"; "All defendants [especially] DOC officials were parties to a special relationship [with] Plaintiff as custodians"; and "Custodians and all defendants listed knew of, created or allowed to continue the actions listed in this complaint . . . ."  (Dkt. 77-1 ¶¶ 19, 24, 25, 28, 30, 31, 35, 40.)

## 2.    Rule 12(b)(6)

The Court also recommends denial of the Motion to Amend because the Proposed Third Amended Complaint fails to state any cognizable § 1983 claim. Amen El appears to assert a § 1983 claim under the Eighth Amendment. (Dkt. 77-1 ¶ 43 (discussing "conditions of incarceration"); *see also id.* ¶¶ 36-37 (discussing "objective attitude" and "subjective attitude"). Defendants argue that Amen El has failed to state a cognizable Eighth Amendment claim. (Dkt. 59 at 9-11.)

Reading the Proposed Third Amended Complaint as a whole, Plaintiff alleges an Eighth Amendment violation because Defendants' action or inaction unnecessarily exposed him to the risk of contracting COVID-19. (*See* Dkt. 77-1.) Amen El describes an outbreak of COVID-19 at MCF-STW, where the first case occurred in September 2020, "944 inmates and over a 100 staff were infected in a two month period," and 700 inmates were infected in a two-week period, and describes the "unreasonable exposure" as occurring between October 27, 2020 to December 4, 2020. (*Id.* ¶¶ 1, 19-22.)

In connection with the Motion to Dismiss Amen El's Second Amended Complaint, which, as stated above, is virtually identical to the Proposed Third Amended Complaint, Defendants argue that Amen El "does not state whether he is claiming that the defendants were deliberately indifferent to his medical needs, whether he is bringing a failure-to-protect claim, or whether he is bringing a claim of cruel and unusual punishment," and that regardless, Amen El has failed to state a valid Eighth Amendment claim. (*See* Dkt. 59 at 9-11.) The Court construes Amen El's claim as a failure-to-

27

protect claim and possibly a claim of cruel and unusual punishment.[12]  (*See* Dkt. 77-1 ¶¶ 1, 2 (asserting "unreasonable exposure to a novel coronavirus" and "cruel and unusual punishment as a matter of sanitation and exposure to contagious disease"); *see also* Dkt. 46 ¶¶ 1, 2 (Second Amended Complaint).)  The Court addresses both below.

      **a.**      **Failure to Protect**

"To prove an Eighth Amendment violation, a prisoner must satisfy two requirements, one objective and one subjective."  *Hines*, 2018 WL 7050674 at \*4 (quoting *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).  "The first requirement

---

[12]     Amen El does not appear to assert a claim for deliberate indifference to medical needs, which requires the plaintiff to demonstrate (1) that he suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (affirming grant of motion to dismiss).  Even if Amen El asserted such a claim:

> Inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.

*Id.* (cleaned up).  In the case of the mental health defendants, Amen El alleges that they "constantly referred" him to "an anxiety class that wasn't occurring."  (Dkt. 77-1 at 13-14 ¶¶ 40-42.)  He has not alleged facts supporting the inference that his anxiety was a "serious medical need," much less facts from which the Court could infer that any Defendant knew his anxiety constituted a "serious medical need" and was deliberately indifferent to that need."  *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).  Further undermining the plausibility of any such claim is the fact that "[a]ll mental health services except group services [we]re available," and "[i]ndividual assessments and crisis intervention [we]re available and [sic] upon request."  (Dkt. 77-2 at 44 ¶ 11.)

tests whether, viewed objectively, the deprivation of rights was sufficiently serious." *Id.* (citation omitted). "The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" *Id.* (citation omitted). "Eighth Amendment cases are analyzed in light of the specific claim raised." *Id.*

To succeed on a failure-to-protect claim under the Eighth Amendment, a prisoner must show (1) they are incarcerated under conditions posing a substantial risk of serious harm and (2) the prison officials subjectively knew of and disregarded that safety risk. *Smith v. Arkansas Dep't of Corr.*, 103 F.3d 637, 644 (8th Cir. 1996). "In prison conditions claims, which include threats to an inmate's health and safety, the subjective inquiry is whether the prison officials were deliberately indifferent to a serious risk of harm to the inmate." *Irving*, 519 F.3d at 446. "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Riley v. Olk-Long*, 282 F.3d 592, 595 (8th Cir. 2002) (cleaned up).

The Court assumes for purposes of the Rule 12(b)(6) analysis that infection with COVID-19 poses an objectively serious medical risk to Amen El. *See Mohammed S. v. Tritten*, No. 20-CV-793 (NEB/ECW), 2020 WL 2750836, at *22 (D. Minn. Apr. 28, 2020) ("With respect to the objective prong, the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals such as those Petitioners with risk factors identified by the CDC."), *R. & R. adopted*, No. 20-CV-783 (NEB/ECW), 2020 WL 2750109 (D.

Minn. May 27, 2020). In any event, Amen El alleges that he suffers from hypertension, anxiety, and chronic stress, which he alleges put him at risk for severe illness or death if he were to contract COVID-19. (Dkt. 77-1 ¶¶ 26-27.)

The question then becomes whether Amen El has alleged facts (rather than conclusions) from which the Court can plausibly infer that the subjective prong is met. "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," namely, a "mental state akin to criminal recklessness." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (citations and quotations omitted).

The Proposed Third Amended Complaint alleges that Defendants "enacted cautionary measures" including "tests, masks, recommended social distancing, suspend[ed] visits temporarily, [and provided] non-alcoholic hand sanitizer, amongst other things" to "reduce transmission," but the measures were "inadequate, ineffective, and or insufficient" because masking policies were not enforced, due to "COVID-fatigue" and insufficient sanitation, and because "contagious inmates" were "mixed" with "noninfected inmates." (Dkt. 77-1 ¶¶ 20-23.) It also alleges that Amen El was placed in Cell 818 on October 27, 2020, which had been previously occupied by a COVID-positive inmate, that the cell was dirty (including a used mask, used linens, and COVID-19 test results), that he asked "Jane Doe" to provide cleaning supplies or a different cell, and that "Jane Doe" denied his request. (*Id.* ¶¶ 28.) Finally, it alleges that transfers to and from MCF-STW were not suspended, that staff exposed to COVID-19 positive persons outside

of MCF-STW were not required to stay home, and that MCF-STW ran out of cleaning supplies during the surge.  (*Id.* ¶¶ 22; 25.)

In his opposition to the Motion to Dismiss, Amen El explained that Count 1 "presents two distinct claims," one based on the alleged "mixing" of "contagious inmates" with him, thereby exposing him to COVID-19, and the second based on the "cumulative cont[inued] impact of exposing [Amen El] to the virus by way of their pattern of reckless negligence," including "reactive decision making, lack of resources, failure to train, condoning insufficient enforcement of precautionary measures, etc." (Dkt. 63 at 3-4 n.2.)  In his reply brief in support of the Motion to Amend, Amen El argues that courts have established that "these sort of claims are viable and relievable," and cites *Maney v. Brown*, 464 F. Supp. 3d 1191 (D. Or. 2020), and *Chatman v. Otani*, No. CV 21-00268 JAO-KJM, 2021 WL 2941990 (D. Haw. July 13, 2021).  (Dkt. 81 at 3-4.)  The Court summarizes those cases below before turning to Amen El's allegations.

In *Chatman*, the plaintiffs filed a putative class action against the Director of the Department of Public Safety ("DPS") in his official capacity alleging that conditions in the State of Hawaii's jails and prisons had contributed to multiple COVID-19 outbreaks. 2021 WL 2941990, at *1.  The complaint in that case alleged instances where certain plaintiffs had personally witnessed COVID-19 positive inmates mingling with COVID-19 negative inmates and transfer of asymptomatic inmates to un-sanitized cells previously inhabited by COVID-19 positive inmates.  *Id.* at *2-3.  Plaintiffs moved for a temporary restraining order, and the court found plaintiffs were likely to succeed on the merits of their Eighth Amendment claim against the DPS based on "personal reports"

from "inmates *and DPS staff*" that established DPS was not following its Response Plan. *Id.* at *14 (emphasis original). Those reports entailed:

- "declarations from inmates and staff averring that not all new inmates [we]re screened or tested for COVID-19, nor [we]re all inmates tested before transferring to another facility," *id.* at *15;

- The plaintiffs' description of a "quarantine" process that involved mixing multiple inmates with unknown COVID-19 statuses in a holding area separated by chain link fences ("the dog cages"), in a room approximately 31.5 feet by 35.3 feet without running water or toilet facilities ("the fishbowl"), and introducing new inmates into those spaces daily; one of the wardens admitted that his facility "frequently lacks the physical space to completely quarantine new inmates for ten days and instead places them in the fishbowl, a multi-purpose room, to monitor them for COVID-19 symptoms and to separate them from the inmate population"; and one of the DPS's lawyers admitted that the intake process at that facility, which preceded any testing and involves the housing of numerous inmates in confined spaces, could, take up to several hours, *id.* at *15-16;

- The plaintiffs' description of "multiple instances of DPS mixing COVID-positive and/or symptomatic inmates with COVID-negative inmates, which resulted in clusters of COVID-19 infections at different facilities," *id.* at *16;

- The plaintiffs' description of inmates being "regularly packed into small spaces," including the dog cages and fishbowl holding areas, which lacked running water, resulting in inmates urinating and defecating on the floor when their requests to

visit the bathroom were denied and making it impossible for inmates to wash their hands, *id.*;

- The plaintiffs' statements that inmates were not provided with cleaning products in the dog cages and fishbowl, *id.*;

- The plaintiffs' statements that "mask wearing [wa]s inconsistent at best with minimal enforcement, if at all, and masks and PPE [we]re not necessarily provided to staff," *id.* at *17; and

- The plaintiffs' statements that cleaning supplies were not available or were watered down, *id.*

Notably, the DPS offered only "summaries of provisions in the Response Plan without specific examples of compliance" and their descriptions of any new measures were "couched in generalities." *Id.* at *18. Accordingly, the *Chatman* court found that "many of the failures — such as the cramped housing of inmates in the fishbowl at [one of the facilities] or the need for inmates to urinate in cups due to a lack of access to toilets — are more than simple lapses and demonstrate objective deliberate indifference," and also found a "strong likelihood" that the plaintiffs would satisfy the objective prong of their Eighth Amendment Claim. *Id.* at *18.

As to the subjective prong, the *Chatman* court noted that many of the above facts supported a finding of deliberate indifferences, but focused on two undisputed aspects: (1) the failure to properly screen, test, or quarantine new inmates and the (2) evidence that:

Defendant knowingly (1) transported *symptomatic* inmates from a facility *with an active COVID-19 outbreak*, (2) who *told staff* they were ill, (3) who were *infected*, (4) but whose infections were unconfirmed due to *late or no testing*, (5) *on an airplane*, (6) to a facility with no active COVID-19 cases *that previously experienced an outbreak*, and (7) then housed those inmates *with COVID-negative inmates*. There is almost no clearer an example of complete disregard for the Response Plan and abandonment of precautionary measures to prevent the spread of COVID-19 between DPS facilities and islands.

*Id.* at *19 (emphases original).

In *Maney*, the court found no likelihood of success on the merits of a failure-to-protect Eighth Amendment claim based on COVID-19 notwithstanding the fact that the parties "agree[d] that maintaining social distance at all times is impossible in a prison setting," there was evidence of grievances based on "unprofessional staff behavior, inadequate hygiene or cleaning products, [and] failure to enforce social distancing policies," and dozens of inmates had "voiced legitimate concerns about correctional officers not wearing masks, a lack of social distancing, and inadequate testing and care." 464 F. Supp. 3d at 1197, 1199, 1203-04. The Court found "Defendants have responded reasonably to the serious risks posed by the COVID-19 pandemic, and Plaintiffs are therefore unlikely to succeed in demonstrating that Defendants acted with deliberate indifference" based on the measures the defendants were taking to prevent the spread of COVID-19. *Id.* at 1210-15.

The Court first considers the "mixing" aspect of Amen El's Eighth Amendment claim. The Proposed Third Amended Complaint makes repeated conclusory assertions of "mixing" of COVID-19 positive and negative inmates. (*E.g.*, Dkt. 77-1 ¶¶ 21, 23, 29, 37, 40.) Amen El does not, however, allege any instance where he witnessed such "mixing,"

nor does any Affidavit attached to his Proposed Third Amended Complaint describe any such instance.  Rather, Amen El relies on the Darling Declaration as evidence of "mixing."[13]  (*Id.* ¶ 23.)

The Darling Declaration is not as helpful as Amen El seems to think.  It begins by stating that MCF-STW follows MDH guidelines for monitoring, isolation/quarantine, and testing.  (Dkt. 77-2 at 41 ¶ 3.)  Further, during the only instance that could possibly constitute some kind of "mixing"—when COVID-19 positive and negative inmates were housed in the same **unit** due to the surge and space constraints—the Darling Declaration states that COVID-19 positive and negative inmates were not housed in the same **cell**, were not allowed in the common areas at the same time, and that the common areas and phones, showers, kiosks, and washers were cleaned between use.  (*Id.* at 43-44 ¶ 10.) Amen El had the opportunity to dispute Darling's statements as to the measures taken when he filed the Proposed Third Amended Complaint.  He had the opportunity to allege facts showing those measures were unreasonable.  He had the opportunity to identify specific instances of "mixing" or instances when the precautionary rotation and cleaning measures were not taken or enforced during the "mixing" described by Darling.  He did none of those things.  He did not even generally allege the precautionary measures taken during this period were unreasonable.  Rather, he simply relies on the fact that for a short period of time, "mixing"—in the form of housing COVID-19 positive and negative

---

[13]    The Court can consider the Darling Declaration in connection with the Motion to Amend and Motion to Dismiss because Amen El relied on it and attached it to both.  *See Zean*, 858 F.3d at 526 (8th Cir. 2017).

inmates in the same units—occurred.  This is in stark contrast to *Chatman*, where "mixing" was not disputed by DPS, including with respect to inmates housed in the "dog cages" and "fishbowl," and the plaintiffs alleged several specific instances of "mixing." *See* 2021 WL 2941990, at *16.

The Court cannot reasonably infer Eighth Amendment liability where the Proposed Third Amended Complaint and documents attached to it demonstrate that MCF-STW "responded reasonably to the risk" posed by temporarily housing COVID-19 positive and negative inmates in the same unit, namely by taking the measures described by Darling to minimize the risk.  *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994). Moreover, "even if the harm ultimately was not averted" and some inmates caught COVID-19, *see id.*, Amen El has not alleged any facts from which the Court can plausibly infer a "mental state akin to recklessness" with regarding to the "mixing" that occurred during the 2020 surge.  *See Saylor*, 812 F.3d at 644; *see also Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) ("The 'incidence of diseases or infections, standing alone,' do not 'imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.'") (quoting *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009)).

Amen El also bases his Eighth Amendment claim on the "cumulative cont[inued] impact of exposing [Amen El] to the virus by way of [Defendants'] pattern of reckless negligence," including "reactive decision making, lack of resources, failure to train, condoning insufficient enforcement of precautionary measures, etc."  (Dkt. 63 at 3-4 n.2.) This claim appears to be based on allegations relating to sanitation in the kitchen,

transfers to and from MCF-STW, insufficient enforcement of masking and social distancing, his move to Cell 818, insufficient cleaning supplies, and inadequate testing.

As to transfers, Amen El alleges that transfers were not suspended (Dkt. 77-1 ¶ 22), but does not allege any instance where Defendants (or MCF-STW) knowingly transported symptomatic inmates in or out of the facility, much less housed them in a facility with no COVID-19 and with COVID-19 negative inmates. This stands in stark contrast to *Chatman*, where DPS knowingly transported COVID-positive inmates by airplane to facilities with no active COVID-19 cases and then housed them with COVID-19 negative inmates. *See* 2021 WL 2941990, at *19. While Amen El complains of lack of cleanliness in the kitchen due to "cross-contamination" between sewage and food tray preparation, his allegation that "the spread started in the kitchen" is only "[b]ased upon belief and information." (Dkt. 77-1 ¶ 25.) He and other Affiants suggest that sanitation measures in the kitchen were generally inadequate, but they do not identify any instance like that in *Chatman* where the kitchen was not sanitized after known COVID-19 positive inmates worked in the kitchen. *See* 2021 WL 2941990, at *3. And while Amen El alleges that "contagious inmates" were allowed to prepare food (Dkt. 77-1 ¶ 40), he alleges no specifics as to when this occurred, rendering it a conclusory assertion that does not cross the line into plausibility.

Many of the allegations in the Proposed Third Amended Complaint are both conclusory and contradicted by the attached exhibits. For example, Amen El and the Affiants assert that masking and social distancing were not enforced, but the Proposed Third Amended Complaint does not connect any of the instances they describe to any

named Defendant, and the two Kites attached to the Proposed Third Amended Complaint undermine these claims. The first Kite was a nonspecific grievance that staff were not enforcing masking, and the staff response was "[b]oth staff/offenders are to be wearing mask at **all** times." (Dkt. 77-2 at 22 ("all" underlined several times in the original).) The second Kite identified specific instances (by date, location, and cell number) when the policy was not enforced, to which staff responded: "This will be looked into + dealt with." (*Id.* at 23.) These Kites do not support a reasonable inference that masking was not enforced; they support the contrary inference that masking was enforced.

Finally, Amen El's allegations about Cell 818 are insufficient to plausibly allege that any named Defendant knew of but deliberately disregarded a risk to him. Amen El alleges that he was forced to move into Cell 818, which was previously occupied by a COVID-19 positive inmate, and that the inmate's test results, used mask, used linen, and other belongings were still in the cell. (Dkt. 77-1 ¶ 28.) Assuming that this allegation is true, the Darling Declaration states that the COVID-19 positive inmate vacated Cell 818 ten days earlier ( Dkt. 77-2 at 44 ¶ 15), which Amen El does not dispute. Further, Amen El does not allege that any named Defendant knew that Cell 818 was not cleaned, nor has he alleged any facts suggesting any Defendant inferred that Cell 818 presented a substantial risk of serious harm to him after being empty for ten days. (*See* Dkt. 77-1 ¶ 28.) Under these circumstances, Amen El has not alleged any facts from which the Court can infer that any named Defendant deliberately disregarded a substantial risk of serious harm (to the extent there was a risk 10 days after the COVID-19 positive inmate departed) posed to him by Cell 818.

The implementation of and compliance with COVID-19 protocols at MCF-STW may well have been imperfect, and the Proposed Third Amended Complaint and attached exhibits contain allegations of such imperfection.  But "[t]he Eighth Amendment does not mandate perfect implementation."  *Valentine*, 978 F.3d at 165 (staying permanent injunction imposing a detailed protocol on prison to stem the spread of COVID-19 in a prison unit), *cert. denied*, 141 S. Ct. 57 (Nov. 16, 2020).  Several courts have dismissed prisoner's Eighth Amendment claims based on COVID-19 for failure to state a claim under these circumstances.  *See, e.g.*, *Freeman v. United States*, No. 20-13341 (KM) (ESK), 2021 WL 4129479, at *4 (D.N.J. Sept. 9, 2021) (dismissing Eighth Amendment claim based on cleaning a van with insufficient PPE because "even accepting that [the defendant] had personal knowledge of Plaintiff's unique vulnerabilities and the risk the van cleaning posed, Plaintiff concede[d] that he was given PPE, gloves and a non-N95 mask, . . . contradicting any allegation that [the defendant] (or anyone else) disregarded a risk to Plaintiff's safety"); *Wylie v. Bonner*, No. 2:20-cv-02593-TLP-tmp, 2021 WL 261280, at *5-6 (W.D. Tenn. Jan. 26, 2021) ("Plaintiff suggests that [certain prison officials] were constitutionally deficient in trying to manage COVID-19 risks at SCCJC in general.  This does not show that they subjectively knew of a risk in Plaintiff's case and then disregarded it.  . . . Indeed, the Eighth Amendment does not require perfection on the part of prison officials.").  As the District of Idaho explained:

> DOC and ISCC's response to the current pandemic—at least as described in the Amended Complaint—has, to this point, been reasonable. *See Farmer*, 511 U.S. at 844, 114 S. Ct. 1970. Prison officials developed a team to deal with COVID-19 as it affects the prison population. That team has created and implemented policies in an effort to protect the health and safety of inmates

during this crisis. They have undertaken reasonable measures, such as temperature checks, questionnaires, and testing of potentially positive inmates, which show that officials have indeed been taking the risk seriously and considering how best to respond. IDOC is not required to have a perfect response to the pandemic—only one that is free from deliberate indifference. Therefore, the Amended Complaint does not give rise to a reasonable inference that any Defendant has violated the Eighth Amendment with respect COVID-19.

*Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1088 (D. Idaho 2020).

Moreover, courts have found in other contexts that the difficulties inherent in implementing and enforcing COVID-19 precautionary measures are unlikely to support a finding that prison officials acted with deliberate indifference. *See, e.g.*, *Swain v. Junior*, 958 F.3d 1081, 1089-90 (11th Cir. 2020) (staying preliminary injunction issued by district court requiring defendants to employ numerous safety measures to prevent the spread of COVID-19, notwithstanding the fact that "social distancing was 'impossible,'" because the district court cited no evidence to establish that defendants subjectively believed the measures they were taking were inadequate; also criticizing finding of deliberate indifference based on non-uniform enforcement of social distancing where "the district court made no finding that the defendants are ignoring or approving the alleged lapses in enforcement of social-distancing policies"); *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) (finding "lack of 'effective containment measures'" and "not doing 'nearly enough' to combat COVID-19" were "not tantamount to establishing the Government's deliberate indifference"); *Maney*, 464 F. Supp. 3d at 1197, 1199-20, 1110-15 (finding Defendants' reasonable response to COVID-19 meant no likelihood of success as to deliberate indifference notwithstanding the fact that the parties "agree[d]

that maintaining social distance at all times is impossible in a prison setting," there was

evidence of grievances based on "unprofessional staff behavior, inadequate hygiene or

cleaning products, [and] failure to enforce social distancing policies," and dozens of

inmates had "voiced legitimate concerns about correctional officers not wearing masks, a

lack of social distancing, and inadequate testing and care").

Further, numerous courts have found that evidence of prison officials' reasonable

preventative measures taken in response to COVID-19 precludes a likelihood of success

as to the subjective element of an Eighth Amendment claim. *See, e.g.*, *Wilson v.*

*Williams*, 961 F.3d 829, 840 (6th Cir. 2020) ("We conclude that petitioners are unlikely

to succeed on the merits of their Eight Amendment claim because . . . the BOP responded

reasonably to the known, serious risks posed by COVID-19 to petitioners at Elkton" by

implementing certain measures, "including screening for symptoms, educating staff and

inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing

regular cleaning, providing disinfectant supplies, and providing masks"); *Valentine*, 956

F.3d at 801 (criticizing district court's finding that subjective prong was met based on

finding of "inadequate measures" taken to control the spread of COVID-19 because

"inadequate measures" are not dispositive of a defendant's mental state; instead requiring

subjective belief that measures were inadequate); *Money v. Pritzker*, 453 F. Supp. 3d

1103, 1131 (N.D. Ill. 2020) (finding "**Plaintiffs have no chance of success**" on COVID-

19-based Eighth Amendment claim where "Defendants have come forward with a

lengthy list of the actions they have taken to protect [] inmates") (emphasis added).

To summarize, the generalized allegations in the Proposed Third Amended Complaint do not constitute factual content from which the Court can reasonably infer Defendants had the requisite "mental state akin to criminal recklessness." *Saylor*, 812 F.3d at 644 (citations and quotations omitted); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). When the Proposed Third Amended Complaint itself contains descriptions of the precautionary measures taken by MCF-STW, and the allegations of imperfect implementation and noncompliance are general, lack any connection to any named Defendant, or both, the Court concludes that the Motion to Amend is futile insofar as the Proposed Third Amended Complaint does not state a claim for an Eighth Amendment violation. *See Foster v. Minnesota Dep't of Corr.*, No. A20-0976, 2021 WL 1346617, at *3 (Minn. Ct. App. Apr. 12, 2021) ("But [plaintiff] cannot prove an Eighth Amendment claim by showing that prison staff did not consistently follow COVID-19 protocols or that prison staff were not properly trained or supervised.  To prevail, he must show that the commissioner and the warden 'knew of and disregarded an excessive risk to inmate health or safety.'  [Plaintiff] has submitted numerous affidavits of prisoners, but those affidavits do not contain evidence that the commissioner or the warden knew that prison staff were creating an excessive risk by not following social-distancing and mask-wearing protocols.") (affirming finding of no deliberate indifference).

### b.    Cruel and Unusual Punishment

Amen El may be asserting an Eighth Amendment claim based on the sanitation measures at MCF-STW, including in the kitchen, "mixing," ineffective enforcement of COVID-19 precautionary measures, and his move to Cell 818.  (Dkt. 77-1 ¶¶ 20, 21, 25, 28.)  Defendants contend that to the extent Amen El asserts that the alleged conditions at MCF-STW amounts to cruel and unusual punishment in violation of the Eight Amendment, it does not, and that there is "[n]othing in Amen El's complaint [that] alleges that the defendants' alleged conduct deprived him of 'minimal civilized measure of life's necessities.'"  (Dkt. 59 at 11.)

The Eight Amendment prohibits "cruel and unusual punishment," U.S. Const. amend. VIII, and requires that "prisoners [must] be provided humane conditions of confinement, to include adequate food, clothing, shelter, and medical care," *LaDoucer v. Sherburne Ct. Jail*, Civil No. 08–4839 JNE/AJB, 2009 WL 5469900, at *6 (D. Minn. Nov. 19, 2009) (citing *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998).  "However, the Constitution 'does not mandate comfortable prisons.'"  *Jackson v. Mike-Lopez*, No. 17-4278 (JRT/BRT), 2018 WL 6696296, at *2 (D. Minn. Dec. 20, 2018) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  As the Defendants point out, the Eighth Circuit has determined that depriving inmates of underwear, blankets, and a mattress (thereby forcing them to sleep on a concrete slab) until they demonstrated "satisfactory behavior" as part of a "progressive four-day behavior program" (that may last longer than four days)—did not amount to the "denial of the minimal civilized measures of life's necessities," even when that inmate "'bottomed out' emotionally and suffered from

temporary depression" while in the program.  *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84-85 (8th Cir. 1996).  Similarly, placing an inmate in a "strip cell" where an inmate was deprived of running water, "any clothing or bedding," "a tooth brush, tooth paste, deodorant, soap, sheets, blankets, pillow cases, pillows, mattresses, his legal mail, and clothing" was insufficient to show "the conditions in the strip cell denied him 'the minimal civilized measure of life's necessities,'" where the inmate was "given three meals a day, including liquid nourishment in the form of milk, and was sheltered from the elements."  *Williams v. Delo*, 49 F.3d 442, 444-46 (8th Cir. 1995).

"[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time."  *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989).  Although Amen El describes the sanitation of the MCF-STW kitchen as inadequate, his assertions of lack of sanitation are too general to state a plausible claim due to unsanitary conditions.  Moreover, while Amen El alleged that items were left in Cell 818, he does not allege how long they remained, when he was given cleaning supplies or when the cell was cleaned, or that the cell itself (other than the leftover items) was unsanitary—particularly when it had been vacant for ten days.  *Cf. See id.* ("Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months."); *Whitnack v. Douglas Cty.*, 16 F.3d 954, 956 (8th Cir. 1994) (no Eighth Amendment violation where "According to the plaintiffs' evidence, Cell C-18's toilet was covered with dried feces on both the inside and outside, the sink was covered with hair and vomit, the floor was covered with garbage and rotting food, and the walls were covered with dried human mucus.  The plaintiffs complained, but [a

44

correctional officer] refused to move them to a different cell and also refused to give them cleaning supplies. A different correctional officer gave the plaintiffs some limited cleaning supplies about three or four hours later, and the next day the plaintiffs received additional cleaning supplies, consisting of a broom, a dust pan, a sponge, a mop, a toilet bowl brush with a concentrated white chemical for toilets, and spray cleaner."). The Court concludes that Amen El has failed to allege facts from which the Court can reasonably infer that the conditions at MCF-STW during the 2020 surge amounted to a denial of the minimal civilized measures of life's necessities.

### c.    Qualified Immunity

Defendants also assert qualified immunity as another reason why Amen El's § 1983 claim is futile. (Dkt. 59 at 12-13.) Amen El originally argued that qualified immunity was not available as a defense (Dkt. 63 at 9), later conceded that the doctrine is available—but argues it does not support dismissal "because there was a constitutional violation and the right against exposure to contagious diseases was well established." (Dkt. 71).

The Supreme Court has laid out qualified immunity's parameters as follows:

> Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This requires a high "degree of specificity." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal citations omitted). A government official is entitled to qualified immunity **unless "both of these questions are answered affirmatively**." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (cleaned up) (emphasis added).

Because the Court finds that Amen El has not sufficiently pleaded that his constitutional right was violated, its inquiry need not proceed further. *See Wever v. Lincoln County, Nebraska*, 388 F.3d 606, 605 (8th Cir. 2004) (stating that in making a qualified immunity analysis, "we must perform two inquiries in proper sequence. First, we must ask whether, when viewed in the light most favorable to the plaintiff, the alleged facts show the official's conduct violates a constitutional right. If the answer to this question is "yes," then we ask a second question.") (quotations and citations omitted).

### d.    State Law Negligence Claim

The Court turns to the state law negligence claim asserted in the Proposed Third Amended Complaint.  Pursuant to 28 U.S.C. § 1367, where a federal court has original jurisdiction, it also has supplemental jurisdiction over "all other claims so related to the claims in the original jurisdiction that they form part of the same case or controversy." *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000).  However, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also Porter v. Williams*, 436 F.3d 917, 920 (8th Cir. 2006) (holding that a trial court may *sua sponte* decline supplemental jurisdiction based on § 1367(c)(3)).

The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 678 (8th Cir. 2012).  The Eighth Circuit has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible."  *Gregoire*, 236 F.3d at 420 (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990)).

Here, these principles counsel that the Court should decline to exercise supplemental jurisdiction over Amen El's state law negligence claim.  Accordingly, the

Court recommends denial of the Motion to Amend as to Count 2. *See Rickmyer v. ABM Sec. Servs., Inc.*, No. CV 15-4221 (JRT/FLN), 2016 WL 1248677, at *5 (D. Minn. Mar. 29, 2016) ("Overall, given that all of the claims in Rickmyer's proposed amended complaint either fail to state a claim upon which relief may be granted or are claims over which the Court would decline to exercise supplemental jurisdiction, Rickmyer's motion to amend is futile and warrants denial."), *aff'd*, 668 F. App'x 685 (8th Cir. 2016); *McPeek v. Unknown Pennington Cty. Officers*, No. 4:17-CV-04015-RAL, 2018 WL 3222560, at *4 (D.S.D. July 2, 2018) (denying motion to amend as futile where "the lone federal claim in [the] proposed amended complaint—the § 1986 claim—is frivolous" and "this Court would not exercise supplemental jurisdiction over the state tort claim, which is the only other claim in the proposed amended complaint").

\* \* \*

For all these reasons, the Court recommends denial of the Motion to Amend on futility grounds.[14]

### III.    MOTION TO DISMISS AND SUPPLEMENT TO SECOND AMENDED COMPLAINT

Because the Proposed Third Amended Complaint is virtually identical to the Second Amended Complaint, the Motion to Dismiss the Second Amended Complaint requires little additional discussion. The Court recommends the Motion to Dismiss be granted because, for the reasons stated in Section II in connection with the Proposed

---

[14]    Normally the undersigned would issue an order on a Motion to Amend, as it is a nondispositive motion. Given the relationship between the Motion to Amend and dispositive Motion to dismiss, the Court instead recommends dismissal.

Third Amended Complaint, the Second Amended Complaint does not comply with Rule 8, fails to allege direct and personal involvement by any Defendant, and fails to state a claim pursuant to Rule 12(b)(6).  The Court also recommends the Court decline to exercise jurisdiction over the state law negligence claim.

The Court also considers Amen El's Supplement to Second Amended Complaint (Dkt. 70).  The Court could entirely disregard this Supplement, as it constitutes an improper motion to amend that does not comply with Local Rule 15.1.  That Rule provides that: "Unless the court orders otherwise, any amended pleading must be complete in itself and must not incorporate by reference any prior pleading."  D. Minn. LR 15.1(a).  The Court has not and will not order the Second Amended Complaint to incorporate the Supplement.

In any event, the Supplement does not change the Court's conclusion that Amen El has not stated a cognizable § 1983 claim in the Second Amended Complaint or Proposed Third Amended Complaint.  It contains only general allegations that Defendants are liable because they are "policymakers" and "responsible for training," and that other Defendants "should've reasonably known" and "not condoned or turned a blind eye to the prison conditions."  (Dkt. 70 at 1-2.)  For the reasons stated in Section II.D.1-2.b, these conclusory allegations fail because they do not plausibly allege any direct or personal involvement by any Defendant and instead rely on theories of supervisory liability that are impermissible under § 1983 law.

The Court turns to the question of whether the dismissal of the Second Amended Complaint should be with or without prejudice.  As explained in *Miles v. Simmons University*,

> [C]ourts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal.  A dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend, or when the record makes clear that any amendment would be futile. On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," particularly where discovery directed toward other, non-dismissed defendants might reveal yet-unknown evidence implicating a dismissed defendant, dismissal without prejudice may be justified.

514 F. Supp. 3d 1070, 1080 (D. Minn. 2021)

Amen El filed the original Complaint on June 8, 2020 (Dkt. 1), and Amended Complaint on October 13, 2020 (Dkt. 12), and the Second Amended Complaint on April 16, 2021 (Dkt. 46).  The operative Second Amended Complaint asserts claims based on a "surge" in COVID-19 at MCF-STW from October 27, 2020 to December 4, 2020.  (Dkt. 46 ¶ 1.)  Defendants filed the Motion to Dismiss on July 15, 2021 (Dkt. 58), prompting Amen El to file a Supplement to Second Amended Complaint on August 4, 2020 (Dkt. 70).  Amen El then filed a Motion to Amend Second Amended Complaint and Proposed Third Amended Complaint on August 20, 2021.  (Dkts. 77, 77-1.)  In other words, Amen El has shown persistent pleading failures, despite one or more opportunities to amend and even after a Motion to Dismiss put him on notice of the deficiencies in his Second Amended Complaint.  *See Miles*, 514 F. Supp. 3d at 1080.  For this reason, and because the Court concludes that any amendment of the § 1983 claim would be futile, the Court

recommends dismissal with prejudice of Count 1 and dismissal without prejudice of Count 2, which is the state law negligence claim.

## IV.    THIRD TRO MOTION

On July 12, 2021, Amen El filed the Third TRO motion asking the Court to "mandate[e] the defendants to test unvaccinated inmates for the coronavirus."  (Dkt. 56 at 1.)  Defendants filed their opposition on July 30, 2021 (Dkt. 66), and on August 4, 2021, Amen El filed a "Judicial Notice and Supplemental Attachment to TRO Motion," in which he now asks the Court to "issue a TRO, prohibiting all DOC defendants from mixing infected inmates [with] non-infected inmates . . . [and] requests the court order the DOC defendants to test every (2) weeks for 90 days and for all defendants to observe CDC recommendations relative to COVID-19."  (Dkt. 69).  The Court construes this as an "Amended Third TRO Motion."  Amen El then filed a reply in support of the Amended Third TRO Motion on August 11, 2021.  (Dkt. 76.)

When determining if a TRO is warranted, a court considers: (1) the likelihood of success on the merits of the plaintiff's claims; (2) the threat of irreparable harm to the plaintiff; (3) the balance between that threat of harm and the injury that granting injunctive relief would inflict on other interested parties; and (4) whether the issuance of a TRO is in the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  No single factor is determinative, and all factors must be viewed in totality when a court decides if relief should be granted.  *Id.* at 113.  That said, "[s]uccess on the merits has been referred to as the most important of the four factors." *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citation

omitted).  Granting emergency injunctive relief is "an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant."  *Id.* at 705.

Having recommended denial of the Motion to Amend and dismissal of the Second Amended Complaint, the Court also recommends denial of the Third TRO Motion and Amended Third TRO Motion.  *See Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) ("[A]n injunction cannot issue if there is no chance of success on the merits.") (citations omitted).  Moreover, the Court is not persuaded by Amen El's assertions as to irreparable harm.  He claims that Defendants posed a "serious threat to Plaintiff's wellbeing" because Defendants "moved 9 inmates from the unit holding [an] infected inmate to Plaintiff's living unit" and that "there was no contract tracing occurring and the facility['s] response is insufficient to protect Plaintiff against being infected [with] the virus."  (Dkt. 69.)  He did not, however, allege that inmates who tested positive for COVID-19 were moved to his unit, when the inmates were transferred to his unit, or explain the threat posed by this transfer, making it difficult if not impossible to conclude there is a threat of irreparable harm to Amen El, particularly when he filed the Third TRO Motion in August 2021 and then filed a series of documents through the fall of 2020.

Moreover, Defendants submitted the declaration of Dr. Amsterdam, Medical Director of the DOC, which describes the DOC's efforts to encourage inmates to get vaccinated and explains that the intake and quarantine measures have been modified in view of the vaccine.  (Dkt. 67 at ¶¶ 8-9.)  Dr. Amsterdam also explains that before vaccinations were available and before the Delta variant, the DOC engaged in mass

testing at a facility if there were more than two active COVID-19 cases. (*Id.* ¶ 11.) As of July 29, 2021:

> The DOC's testing strategy for facility-wide mass testing of offenders and staff is now more targeted and complex. Situations where it would be appropriate to do mass testing at a facility may include: 1) one or more offenders are confirmed to have COVID-19 and it is likely the infection was acquired within the facility; 2) a DOC staff person tests positive and worked in a facility while ill, worked in the 48 hours prior to developing symptoms, or worked in the 48 hours prior to testing if they are asymptomatic; or 3) an offender is confirmed to have COVID-19 and there is no known exposure.

(*Id.*) "Most importantly, the DOC's testing strategy is done in conjunction with recommendations and guidance from MDH." (*Id.*) He also notes drawbacks to mass testing when the prevalence of COVID-19 is low, including false positives resulting in out-of-work staff and restrictions on inmates. (*Id.*)

Having considered the parties' arguments and evidence, and in view of the fact that "courts will not interfere in the conduct, management, and disciplinary control of this type of institution except in extreme cases," *Douglas v. Sigler*, 386 F.3d 684, 688 (8th Cir. 1967), the Court would recommend denying the Third TRO Motion and Amended Third TRO Motion independent of the Court's recommendation for dismissal of the Second Amended Complaint and denial of the Motion to Amend. Amen El simply has not put forth evidence that the conditions he complains of are so extreme as to warrant interfering with MCF-STW's administration of its testing strategy.[15]

---

[15]    The Court need not consider and does not consider Amen El's vaccination status when recommending against granting a TRO.

## V.    "RULE NISI" ORDER TO SHOW CAUSE AND OTHER FILINGS

Finally, the Court turns to the "Rule Nisi" Motion for Order to Show Cause, filed

on January 10, 2022.  (Dkt. 87.)  Amen El asserts that there had been another COVID-19

outbreak at MCF-STW and that "[i]n the past," Defendants previously refused to adhere

to CDC recommendations by mixing positive inmates with negative inmates, partially

enforcing the mask mandate, not allowing inmates to wear gloves and other personal

protective equipment.  (*Id.* at 1.)  He asks the Court to order the Defendants to "answer[]

why the CDC recommendations shouldn't be instructive during this outbreak, including

quarantine time."  (*Id.*)  Defendants respond that this filing, among others, is not a proper

legal pleading under the Federal Rules of Civil Procedure and this Court's Local Rules

and contains new allegations that are unrelated to the Second Amended Complaint.  (Dkt.

95 at 5-8.)  The Court agrees.  Amen El's "Rule Nisi"[16] Motion for Order to Show Cause

is essentially a request for injunctive relief that bears no relation to the claims in the

---

[16]    "'*Nici*' is the Latin word for 'unless,' and a rule *nici* 'is one which will definitely
conclude the defendant's rights unless, within the prescribed time, he shows cause to set
it aside or successfully appeals.'"  *Blodgett v. Iowa*, No. 4:16-cv-00490-JAJ, 2017 WL
11506417, at *1 n.1 (S.D. Iowa. March 20, 2017) (quoting Black's Law Dict. (5th Ed.
1979)).  28 U.S.C. § 1651(b), also known as the "All Writs Act" permits a "justice or
judge of a court which has jurisdiction" to issue an "alternative writ or rule nisi."  28
U.S.C. § 1651(b); *see also Taylor v. United States*, No. 1:10-cv-01195-JDB-jay, 2019
WL 8440696, * 3 (W.D. Tenn. Sept. 6, 2019).  "The All Writs Act does not confer
original jurisdiction on federal courts. . . . [i]nstead, [it] is a residual source of authority to
issue writs that are not otherwise covered by a statute."  *Lopez-Arroyo v. United States*,
2018 WL 3770051, at *3 (E.D. Cal. Aug. 8, 2018) (citations omitted).  To the extent
Amen El's "Rule Nisi" seeks an injunction under the All Writs Act, a dismissal is
recommended because "such relief should be granted only in the most critical and exigent
circumstances when the legal rights at issue are indisputably clear," which is not present
here.  *Id.* (citing *Brown v. Gilmore*, 533 U.S. 1301, 1302 (2001)) (quotations omitted)
(cleaned up).

Second Amended Complaint or Proposed Third Amended Complaint (which relate to events occurring from October 27, 2020 to December 4, 2020), and lack the supporting papers required by Local Rule 7.1. Moreover, as stated in connection with the Third TRO Motion and Amended Third TRO Motion, Amen El has not shown such extreme conditions that would justify the Court's interference with MCF-STW's COVID-19 response, particularly when the record and the pleadings establish that MCF-STW is following MDH guidance. The Court therefore recommends denial of this Motion.

Finally, the Court turns to Amen El's "Judicial Notice" filings (Dkts. 83, 85, 86). All of these filings contain allegations regarding MCF-STW's COVID-19 protocols and two assert that Defendants are retaliating against Amen El. (Dkts. 83, 85, 86.) Rule 201 of the Federal Rules of Evidence provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Defendants argue that "the 'facts' that Amen El wants this Court to judicially notice are far outside the scope of Rule 201(b) because they are subject to reasonable dispute." (Dkt. 95 at 6 (citing *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 830 (8th Cir. 2003)). The Court agrees, and recommends against taking judicial notice of Docket Entries 83, 85, and 86.

## VI.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**RECOMMENDED that**:

1. Plaintiff Pharaoh El-Forever Left-i Amen El's "Purposed [sic] Third Amended Complaint" (Dkt. 77), which the Court construes as a Motion to Amend the Second Amended Complaint, be **DENIED**;

2. Plaintiff Pharaoh El-Forever Left-i Amen El's Motion for a Temporary Restraining Order (Dkt. 56) be **DENIED**;

3. Defendants' Motion to Dismiss be (Dkt. 58) be **GRANTED** and the Second Amended Complaint be **DISMISSED WITH PREJUDICE** as to Count 1 and **DISMISSED WITHOUT PREJUDICE** as to Count 2;

4. Plaintiff Pharaoh El-Forever Left-i Amen El's "Rule Nisi" (Dkt. 87) which the Court construes as a Motion for Order to Show Cause, be **DENIED.**

5. Plaintiff Pharaoh El-Forever Left-i Amen El's "Judicial Notices" (Dkts. 83, 85, 86) be **REJECTED**.

Dated: January 31, 2022          *s/Elizabeth Cowan Wright*
                                 ELIZABETH COWAN WRIGHT
                                 United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c)